# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 10, 2012 Session

## STATE OF TENNESSEE v. JOHN SMITH

**Direct Appeal from the Criminal Court for Shelby County**
No. 08-07885      Carolyn Wade Blackett, Judge

No. W2011-01438-CCA-R3-CD  - Filed September 25, 2012

The defendant, John Smith, was convicted by a Shelby County Criminal Court jury of first degree felony murder, second degree murder, aggravated burglary, and employing a firearm during the commission of a felony and was sentenced to an effective term of life imprisonment plus six years.  On appeal, he argues that:  (1) the trial court erred in denying his motion to suppress his statements; (2) the evidence is insufficient to sustain his felony murder conviction; (3) the trial court erred in its instruction given on the defense of defense of others; and (4) the trial court erred in denying his request for a jury instruction on the defense of ignorance or mistake of fact.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Harry E. Sayle, III (on appeal); and Sanjeev Memula and Clifford T. Abeles, Jr. (at trial), Assistant Public Defenders, for the appellant, John Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Amy P. Weirich, District Attorney General; and Gregory Gilbert and Lora Fowler, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant was indicted on charges of first degree felony murder, first degree premeditated murder, aggravated burglary, and employing a firearm during the commission

of a felony due to his and a co-defendant's, James Snipes, involvement in the shooting death of the victim, Charles Beegle, Jr.

## Motion to Suppress

The defendant filed a motion to suppress his statements to the police, and a hearing was held on the motion prior to trial. At the hearing, Sergeant Joe Stark of the Memphis Police Department testified that his first encounter with the defendant occurred on August 3, 2008. On that date, Sergeant Stark went to pick up the defendant from the jail at 8:55 a.m. Upon arriving at the homicide office, the defendant was allowed to use the restroom and given a snack and something to drink. At 10:03 a.m., Sergeant Stark advised the defendant of his rights, at which time the defendant informed him that he had an attorney. Based on the defendant's invocation of his rights, Sergeant Stark left the interview room. The defendant remained in the interview room, secured to a bench.

A few minutes later, the defendant started yelling that he wanted to talk to someone, so Sergeant Stark and Sergeant Davidson returned to the interview room. Sergeant Stark advised the defendant of his rights again, and the defendant said, "I am going to talk to you, but I want a cigarette, I want to talk to my dad and I want to talk to my lawyer." When Sergeant Stark asked the defendant for his attorney's name, the defendant responded, "Jeff Rosenblum." The defendant then began to question the officers about the case and the charges against him. Sergeant Stark informed the defendant that he was going to be charged with first degree murder and that they were going to take him back to the jail. At that point, the officers left the interview room again, and Sergeant Stark asked Sergeant Max to prepare the defendant to be transported back to the jail. According to Sergeant Stark, the defendant refused to waive his Miranda rights the second time at 10:17 a.m.

Shortly after Sergeant Max went into the interview room, he came out and informed the other officers that the defendant wanted to talk to them. Sergeants Stark and Davidson returned to the interview room and advised the defendant of his rights a third time, at 10:44 a.m. This time, the defendant waived his rights and the officers interviewed him and then took a typed statement from him, which the defendant signed at 3:37 p.m. In his statement, the defendant denied being responsible for the victim's death and said that James Snipes was the person responsible. Sergeant Stark recalled that the defendant appeared to be sober and not under the influence of any substance, and he was not threatened or coerced into giving a statement.

After Snipes, a co-defendant, was interviewed, Sergeant Stark returned to the defendant and confronted him with contradictions in their stories. Thereafter, the defendant gave another typed statement, which he signed at 5:10 p.m. Specifically, the defendant had

not told the officers in his first statement about being in possession of a .38 revolver and shooting the victim or about Jesus Lujan being present at the time of the killing.

Sergeant James Terry Max of the Memphis Police Department testified that he was asked to prepare the defendant to be transported back to the jail. When he entered the interview room, the defendant asked what was going on, and Sergeant Max responded that he was going to take the defendant back to the jail. The defendant queried again as to what was going on, and Sergeant Max said to him, "I can't discuss with you what's going on, you don't want to waive your rights, I can't talk about this case." According to Sergeant Max, the defendant then stated that he wanted a cigarette and wanted to talk. Sergeant Max left the room and informed Sergeant Hanks, the case coordinator, that the defendant wanted to talk. Sergeant Max had no further interaction with the defendant.

The defendant testified that he was taken to the homicide department around 9:00 or 10:00 p.m. on August 2, 2008. He said that he told the officers that he was intoxicated on "[h]eroin, powder and some pills." Due to his condition, the defendant was taken to the jail. He claimed that he was "dope sick" that evening and was not provided with medical attention. He eventually fell asleep around 2:00 or 3:00 a.m. on August 3 and was awoken at 7:38 a.m. The defendant recalled that Sergeants Stark and Davidson picked him up and took him to the homicide office around 10:00 a.m.

The defendant denied that the officers ever offered him anything to eat or drink. However, he said that the officers allowed him to use the restroom after he told them that his stomach was hurting from having used heroin. He said that he could tell he was suffering from heroin withdrawals but admitted that he did not explain that to the officers.

The defendant corroborated Sergeant Stark's testimony that Sergeant Stark left the room after the defendant refused to waive his Miranda rights and requested an attorney. However, the defendant denied that he thereafter screamed and yelled for Sergeant Stark to return, claiming instead that the officers came back in after ten or fifteen minutes without his beckoning. He recalled that, when the officers returned, they asked him if he wanted to make a statement. Similarly to Sergeant Stark, the defendant stated that he refused to waive his rights and requested a cigarette, to speak with his father, and to speak with his attorney, Jeff Rosenblum. Upon the defendant's refusal, the officers left the room again.

The defendant recalled that, ten or fifteen minutes later, Sergeant Max entered the room and told him that it was all right if he did not want to make a statement because Snipes, his co-defendant, had given them information. He claimed that Sergeant Max also told him that he was going to get the death penalty because there was someone who was going to testify against him. He said that Sergeant Max told him, however, that he would receive a

sentence of thirteen to fifteen years if he gave a statement. Based on what Sergeant Max told him and his fear of receiving the death penalty, the defendant decided to make a statement.

On cross-examination, the defendant admitted that neither Snipes nor anyone else saw him take heroin or powder cocaine on the day of the offenses. However, he said that Snipes saw him take Ecstasy, Xanax, Seroquel, and marijuana. He acknowledged that nowhere in his statement did he say that he was giving the statement in order to not face the death penalty and instead receive a sentence of thirteen to fifteen years.

The trial court denied the defendant's motion to suppress, finding that his statements were not given in violation of his Fifth Amendment rights.

**Trial**

**State's Proof**

Charles Eddie Beegle, III, the victim's son, was living with his father at 4370 Zelda Lane in Memphis at the time of his father's death. On August 1, 2008, Beegle left the house around 7:00 p.m. to spend the night with a friend. Around 9:00 a.m. the next morning, a friend of his father's called to tell him that he needed to come home. When he arrived at the house around 10:00 a.m., the police were there and the house was surrounded with crime scene tape. Shortly after he arrived, he learned that his father had been shot and was dead.

After the police left the scene, Beegle inspected the inside of the house and noticed that it was in a much different condition than it had been when he left the previous night. In the living room, the couch cushions had been turned up and items had been knocked onto the floor. In the victim's bedroom, clothes had been pulled out of the closet and the dresser drawers were open, appearing as though they had been rummaged through. He also noticed that the metal tins in which his father kept his marijuana were not in their normal locations and had been opened. Money was missing from the victim's dresser, and one of his wallets was on the floor. Further examination of the house revealed that the sliding glass door in the back of the house appeared to have scratches and pry marks as though someone had tampered with it, and the BB gun that the victim kept next to the back door was missing. The victim's cell phone was also missing.

Darrell Sebring, a neighbor and friend of the victim's, was visiting the victim the evening of July 31, 2008, around 6:00 or 7:00 p.m., when three people in a blue Ford Sport Track stopped by the victim's house, and one of the young men in it was identified to

Sebring by the victim as James Snipes. Snipes asked the victim, "Do you have some?" Sebring acknowledged that the victim was known to sell drugs and that the victim told him that Snipes had taken drugs from him before.

Randy Broome, a neighbor of the victim, was outside the morning of August 2, 2008, around 9:00 a.m., when he heard gunshots coming from the direction of the victim's house followed by a man yelling for help. Bonnie Hazel, another neighbor of the victim, heard what appeared to be gunshots coming from the direction of the victim's house between 9:00 and 9:30 that same morning and heard someone crying for help. Shortly after hearing the gunshots, Hazel saw a white male outside the victim's house. Hazel also noticed a dark blue or black truck parked in front of the victim's house and then saw the truck leave. Because the truck's windows were tinted, Hazel could not see who was inside. She then saw another white male, wearing baggy pants and no shirt and carrying what appeared to be a rifle behind his back, walk down the victim's driveway. She next saw the truck return and pick up the young man. At that point, Hazel, her brother, and another neighbor went to the victim's home to check on him. When they arrived, they saw the victim lying facedown on the carport with a pool of blood under his head and not breathing.

Sergeant Roger Wheeler, a crime scene officer with the Memphis Police Department, processed the scene at the victim's house, which included taking photographs and collecting evidence. Among the items of evidence collected at the scene were three .25 caliber automatic shell casings and a cigarette butt.

Dr. Miguel Laboy, a forensic pathologist with the Shelby County Medical Examiner's Office, conducted the autopsy on the victim and determined that he suffered three gunshot wounds, one to the upper portion of the head, one to the left shoulder, and one to the front left side of the chest. With regard to the head wound, determined to be the lethal injury, Dr. Laboy hypothesized that the slightly downward wound track was consistent with the gun being above the victim's head. Two bullets and one bullet fragment were recovered during the autopsy. It was determined that the victim died from multiple gunshot wounds.

Officer Richard Morrow with the Memphis Police Department was on patrol around 1:00 p.m. on August 2, 2008, when he saw a dark blue Ford Explorer truck matching the description of the one seen at the scene of a homicide earlier that day. As soon as he saw the truck, it made a quick right turn and started accelerating. Officers pursued the vehicle, trying to get it to stop, but it would not comply. During the pursuit, Officer Morrow saw the defendant slide open the back window of the truck and point a black automatic handgun out the window in his direction. When the truck ran a red light, another car came through the intersection and hit it, bringing the pursuit to an end. The driver of the truck, James Snipes, fled the scene, but the defendant remained in the vehicle and was taken into custody.

Officer Stacy Milligan, a crime scene officer with the Memphis Police Department, was dispatched to the scene of the crash where he assisted in processing the crashed Ford Explorer truck. Among the contents found in the truck were $475 of cash under the driver's side visor and marijuana on the console. Two weapons were collected from the vehicle – a loaded .380 nine-millimeter handgun found on the front driver's side of the vehicle and a loaded .25 caliber handgun found on the floorboard of the back of the vehicle on the passenger's side.

Lieutenant Barry Hanks of the Memphis Police Department transported buccal swabs taken from James Snipes and a .38 special Colt revolver recovered from a location revealed by Jesus Lujan to the Tennessee Bureau of Investigation ("TBI") Crime Laboratory for testing. Lieutenant Hanks also transported three .25 caliber shell casings and a cigarette butt found at the crime scene, a three bullet pack retrieved from the medical examiner's office, and the .25 caliber and .380 nine-millimeter handguns recovered from the wrecked truck. Lieutenant Hanks also noted that the victim's cell phone was located in the bed of the wrecked truck.

Qadriyyah Debnam, a forensic scientist with the TBI Crime Lab at the time of the offenses, tested the cigarette butt submitted by Lieutenant Hanks and determined that the DNA on it was a match to James Snipes. Donald Carman, another forensic scientist with the TBI Crime Lab, tested the weapons, the three .25 caliber shell casings, and the bullets and bullet fragment retrieved from the medical examiner's office that were submitted by Lieutenant Hanks. All of the bullets and shell casings were fired from the submitted weapons. The bullet fragment was consistent with being fired from the submitted .25 caliber weapon.

On August 3, 2008, around 10:30 a.m., Sergeant Max was asked by Sergeant Stark to get the defendant ready for transport back to the jail from the interview room due to the defendant's refusal on two occasions to waive his Miranda rights. The defendant inquired as to what was going on, and Sergeant Max informed him that he could not talk about the case. The defendant told Sergeant Max that he wanted a cigarette and then would talk to the officers, which Sergeant Max relayed to Sergeant Stark, the interviewing officer. Sergeant Max denied telling the defendant he would get the death penalty if he did not talk to the officers or that he would get thirteen to fifteen years if he did talk to them.

Lieutenant Walter Davidson with the Memphis Police Department was involved in arresting the defendant after the wreck and placed him on a forty-eight-hour hold due to his intoxication. The next day, having no appearance of intoxication and able to communicate clearly, the defendant was brought to the homicide bureau for questioning. After twice refusing to waive his Miranda rights, the defendant was being prepared for return to the jail

when he decided to talk to the officers. Upon being read his rights a third time, the defendant waived them and ultimately gave two typewritten statements.

In his first statement, the defendant denied any responsibility for the victim's death but, instead, blamed the murder on his co-defendant, James Snipes. Specifically, the defendant said that he and Snipes were driving around smoking marijuana when Snipes started talking about "making money." Snipes then stopped at the victim's house and said, "[L]et's go in." According to the defendant, before Snipes made it in the house, the victim spotted him and started chasing him. The defendant said that Snipes and the victim "scuffled" and then he heard gunshots. He recalled that Snipes told him that he shot the victim because the victim grabbed him and would not let him go. According to the defendant, Snipes was armed with a .25 caliber automatic, but he was not armed. When questioned about the subsequent police chase, the defendant admitted that he was in the backseat of the truck and armed with a .25 caliber automatic but claimed that it and the .380 belonged to Snipes.

After taking the defendant's first statement, officers learned that Jesus Lujan was in the truck with Snipes and the defendant at the time of the murder and that the defendant had been armed with a .38 revolver. The officers confronted the defendant with the inconsistencies from that in his first statement. In his second statement, the defendant admitted that his initial statement was not completely accurate. He confirmed that Lujan was in the truck with him and Snipes when they went to the victim's home and that he was armed with a .38 special revolver provided to him by Lujan. The defendant also admitted that he entered the victim's house with Snipes. According to the defendant, after they entered the house, "'the victim s[aw] [Snipes] [and] chased him outside. They started [to] wrestle and [Snipes] shot him to get him off and while the victim was on the ground, I shot him in the face.'" He gave the .38 special revolver back to Lujan after the shooting.

**Defendant's Proof**

The defendant testified that the night before the shooting, he and Snipes were partying at another friend's house. He had been "smoking weed, taking ex- pills, snorting heroin, snorting powder and popping Xanax pills." Around 8:00 a.m. the next morning, the defendant, Snipes, and Jesus Lujan left in a blue Ford Sport Track with Snipes driving to go buy more marijuana. Snipes drove them to the victim's house, although the defendant did not know who lived in the house or who the victim was; he just thought they were going to buy marijuana.

Snipes parked the truck, and the defendant and Snipes got out and walked toward the house. Snipes was armed with a .25 caliber automatic. The defendant lagged behind, and

his vision of Snipes was blocked by a fence. When he walked around the fence, he saw that Snipes was not at the victim's front door, so he walked toward the back of the house. He was about to knock on the sliding glass door when Snipes came running down the hallway yelling for him to run. The defendant grabbed a BB gun that was sitting next to the sliding glass door and ran toward the truck. When he was about five or ten feet from the truck, he "heard a couple of gunshots and . . . heard a guy scream and . . . heard James Snipes yell for [his] help." He ran back to help his friend and saw Snipes and the victim "tussling on the ground in front of the van." Snipes was standing up and the victim was on his knees with one arm wrapped around Snipes's legs and holding a pistol in his other hand. The two were fighting over the gun, but the defendant did not know at that time to whom the gun belonged. He saw blood on Snipes's stomach and shorts, so he screamed. The victim looked at him, and, thinking the victim had shot Snipes, he shot the victim one time.

The defendant and Snipes ran to the truck and drove Lujan back to their other friend's house. He did not call the police because he was scared and intoxicated. He also felt bad for shooting the victim after he learned that Snipes was not hurt. They continued to drive around "getting high" and then drove back by the scene at the victim's house. Two police cars were in the area and, when Snipes saw them, he made a sharp right turn and sped away. The police gave chase, but the pursuit ended when their vehicle was hit by another car at a traffic signal. Snipes got out of the truck and ran, but the defendant remained because he was intoxicated and felt that he had not done anything wrong. The defendant denied using a weapon at any time during the pursuit.

The defendant was arrested at the scene and taken to the police station. Because he was too intoxicated to give a statement that night, he was put on a hold and taken to a cell. The next morning, he was taken to the homicide office and eventually gave two statements, neither of which was entirely accurate, due to Sergeant Max's telling him that he would get the death penalty. Prior to giving the statements, he had twice requested an attorney. On cross-examination, the defendant admitted that "[t]here's a chance" he yelled for the officers to return to the interview room after they left the first time.

After the conclusion of the proof, the jury convicted the defendant of first degree felony murder, the lesser-included offense of second degree murder, aggravated burglary, and employing a firearm during the commission of a felony.

## ANALYSIS

### I. Motion to Suppress

The defendant argues that the trial court erred in denying his motion to suppress

because his "unequivocal assertion of his Fifth Amendment privilege was not 'scrupulously honored.'" When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Thus, to be admissible at trial, a confession made while under custodial interrogation must be shown to have been freely and voluntarily given, after the defendant's knowing waiver of his constitutional right to remain silent and to have an attorney present during questioning. See Miranda v. Arizona, 384 U.S. 436, 444 (1966). The State has the burden of proving the waiver by a preponderance of the evidence at the hearing on the motion to suppress. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997). In determining whether a defendant has validly waived his Miranda rights, courts look to the totality of the circumstances. State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992). If a suspect invokes his right to counsel under the Fifth Amendment, he or she "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484-85 (1981).

According to the State's proof presented at the suppression hearing, the defendant was advised of and invoked his right to counsel during his first interaction with Sergeant Stark at 10:03 a.m. on August 3, 2008, after which Sergeant Stark immediately left the interview room. The defendant then began to yell that he wanted to talk to somebody, so Sergeant Stark and Sergeant Davidson returned to the interview room. The defendant was again advised of his rights, to which he responded, "I am going to talk to you, but I want a cigarette, I want to talk to my dad and I want to talk to my lawyer." He refused to sign the waiver form the second time at 10:17 a.m. The defendant then began to question the officers about the case and the charges against him, and Sergeant Stark informed him that he was going to be charged with first degree murder and that they were going to take him back to

-9-

the jail. At that point, the officers left the interview room again and asked Sergeant Max to prepare the defendant to be transported back to the jail.

When Sergeant Max entered the interview room to prepare the defendant for transport back to the jail, the defendant asked him what was going on and he responded that he was going to take the defendant back to the jail. The defendant queried again as to what was going on, and Sergeant Max said to him, "I can't discuss with you what's going on, you don't want to waive your rights, I can't talk about this case." The defendant then stated that he wanted a cigarette and wanted to talk. Sergeant Max left the interview room and informed the other officers that the defendant wanted to talk. Sergeants Stark and Davidson returned to the interview room and advised the defendant of his rights a third time, at 10:44 a.m. The defendant waived his rights, and the officers interviewed him and then took a typed statement from him.

The defendant testified that he did not scream and yell for Sergeant Stark to return to the interview room the second time, claiming instead that the officers just came back in after ten or fifteen minutes without his beckoning. He also testified that, when Sergeant Max entered the interview room, he told the defendant that it was all right if he did not want to make a statement because Snipes had given them information and that he was going to get the death penalty because there was someone who was going to testify against him. He said that Sergeant Max told him that he would receive a sentence of thirteen to fifteen years if he gave a statement. However, he acknowledged that nowhere in his statement did he say that he was giving the statement in order to not face the death penalty and instead receive a sentence of thirteen to fifteen years.

We initially note that any conflicts in the testimony at the suppression hearing were resolved by the trial court as the trier of fact. As accredited by the trial court, the testimony at the suppression hearing shows that, after the initial contact with the defendant at 10:03 a.m, the officers did not initiate any further conversation with the defendant. Instead, it was the defendant who continued to initiate conversations with the officers despite the invocation of his right to counsel and, of his own accord, decided that he wanted to give a statement to the officers. Thus, the defendant's invocation of his right to counsel was anything but unequivocal. In looking at the totality of the circumstances surrounding the giving of the defendant's statements, the evidence does not preponderate against the trial court's finding that the defendant's statements were not made in violation of his Fifth Amendment rights.

## II. Sufficiency of the Evidence

The defendant argues that the evidence is not sufficient to sustain his conviction for

murder in the perpetration or attempted perpetration of burglary, arguing there was no proof that committed or intended to commit burglary.

When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

For the purposes of this case, felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . burglary." Tenn. Code Ann. § 39-13-202(a)(2) (2010). "No culpable mental state is required . . . except the intent to commit the enumerated offenses or acts." Id. § 39-13-202(b). Proof of the intention to commit the underlying felony and at what point it existed is a question of fact to be decided by the jury after consideration of all the facts and circumstances. State v. Buggs, 995 S.W.2d 102, 107 (Tenn. 1999). Burglary occurs when one, "without the effective consent of the property owner, . . . [e]nters a building . . . with intent to commit a felony, theft or assault[.]" Tenn. Code Ann. § 39-14-402(a)(1).

Again, the defendant argues that there was no evidence to support the underlying felony of burglary in this case and therefore his felony murder conviction should be reversed. However, in the light most favorable to the State, there is sufficient evidence for a rational trier of fact to find that the defendant committed or intended to commit burglary. In such light, the proof at trial showed that the defendant and his co-defendant went to the victim's home for the purpose of "making money." The record reveals that the sliding glass door at the back of the victim's residence appeared to have scratches and pry marks around it as though someone had tampered with it, and the inside of the home had been ransacked with the victim's cell phone, money, BB gun, and marijuana missing. When the defendant was caught and arrested, the officers found cash, marijuana, and the victim's cell phone in the vehicle in which the defendant was found. See James, 315 S.W.3d at 450 (stating that possession of recently stolen property, unless satisfactorily explained, creates permissible inference that defendant gained possession through theft or had knowledge that the property had been stolen). Moreover, in the defendant's second statement to police, he admitted that he entered the victim's home with Snipes, and he admitted at trial that he took the victim's BB gun. Thus, the direct and circumstantial evidence is sufficient to support the jury's conclusion that the defendant committed or intended to commit a burglary to sustain his felony murder conviction.

## III. Defense of Others Jury Instruction

The defendant argues that the trial court erred in its instruction to the jury regarding the defense of others in that it included language precluding the defense where an innocent third person is recklessly injured or killed. Specifically, the defendant contends that the

language from the Tennessee Pattern Jury Instruction, "[t]his defense is not available to the defendant if the victim was an innocent third person who was recklessly injured or recklessly killed by the [d]efendant's use of force," was "irrelevant and unsupported in the record."

At the close of the proof, defense counsel requested that the court give an instruction on defense of a third person based on the defendant's belief that he was defending Snipes when he shot the victim. After discussion by the parties, the trial court agreed to instruct the jury on the defense. When the court inquired whether defense counsel had an instruction drafted, he responded, "I would just go with the Tennessee pattern instruction." At some point thereafter, the court's proposed instruction must have been brought to defense counsel's attention because the record contains a "Consent Order Adding a Statement of the Proceedings to the Record," in which it is memorialized that there was an off-the-record bench conference held during which defense counsel objected to the inclusion of the language concerning reckless injury or death of an innocent third party. According to the consent order, defense counsel argued that there was no support in the record for the inclusion of such language and that it would confuse the jury, but the trial court gave the complete instruction.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). An instruction will be considered prejudicially erroneous only if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (citing State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998)).

Upon review, we conclude that the trial court did not err in giving the jury the complete charge on defense of others. Based on the testimony at trial, the jury was left to make the factual determination whether the victim was an aggressor or an innocent third party. The applicable law clearly allowed the defendant to claim that he was defending Snipes from the actions of a third person who was threatening or using deadly force against Snipes. However, the law also precluded the defendant from obtaining relief under a claim of defense of others if the jury were to find that the victim was innocent. Based on the facts presented to the jury and the applicable law, the charge provided by the court was a correct and complete statement of the law and not misleading to the jury.

## IV. Ignorance or Mistake of Fact Jury Instruction

The defendant argues that the trial court erred in denying his request for a jury instruction on the defense of ignorance or mistake of fact, asserting that the proof presented supported such instruction.

At the close of proof, defense counsel also requested that the trial court give a jury instruction on the defense of mistake because their defense was based upon the mistaken fact that Snipes was not the aggressor in the struggle between Snipes and the victim. After discussion by the parties, the court noted that defense counsel could still argue, under the law applicable to self-defense, that the defendant acted in "mistaken self-defense" but that a specific jury instruction on mistake was not warranted.

"In determining whether a defense instruction is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001) (citing Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975); State v. Bult, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998)). "[I]gnorance or mistake of fact is a defense to prosecution if the ignorance or mistake negates the culpable mental state of the charged offense." Tenn. Code Ann. § 39-11-502(a). The trial court must instruct the jury on the defense if it is fairly raised by the proof. Id. § 39-11-203(a), (c). However, the defense "is a narrow defense." Id. § 39-11-502, Sentencing Comm'n Comments.

Here, the *mens rea* required for a felony murder conviction is the intent to commit the underlying felony, in this case burglary. Tenn. Code Ann. § 39-13-202(b). Burglary occurs when one, "without the effective consent of the property owner, . . . [e]nters a building . . . with intent to commit a felony, theft or assault[,]" id. § 39-14-402(a)(1), and can be established by showing that the defendant acted intentionally, knowingly, or recklessly. Id. § 39-11-301(c). The defendant's claim that he was mistaken in his belief that Snipes needed to be defended was not relevant to negating the culpable mental state for burglary. Thus, the trial court did not err in denying the defendant's request for an instruction on mistake of fact or ignorance.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE